### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF NEW MEXICO

ALBERT SANDOVAL,

    Plaintiff,

v.                                                         CIV 06-0335 WPL/ACT

SOUTHWEST AIRLINES CO.,

    Defendant.

### MEMORANDUM OPINION AND ORDER

Plaintiff Albert Sandoval brought an action in New Mexico state court for breach of contract and breach of the covenant of good faith and fair dealing. (Compl., Doc. 1 Ex. B.) Defendant Southwest Airlines (Southwest), removed the action to this Court pursuant to 28 U.S.C. §§ 1441 and 1446, arguing that Sandoval's claims were preempted by the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq*. (Doc. 1.) This matter is before me now on Southwest's Motion to Dismiss (Doc. 2), converted to a motion for summary judgment (*see* Doc. 27), and Sandoval's Motion for Remand (Doc. 12). Having considered the briefs, pleadings, and applicable law, I will deny the motion for remand and grant the motion to dismiss converted to a motion for summary judgment.

### BACKGROUND

Albert Sandoval worked for Southwest as a reservation sales agent in Albuquerque, New Mexico. (Compl. at 2, Doc. 1 Ex. B.) He was a member of the International Association of Machinists and Aerospace Workers (IAM) of the AFL-CIO. (Carey Aff. ¶ 5, Doc. 3 Ex. A.) On September 6, 2005, Sandoval attended a hearing regarding an August 1, 2005 telephone reservation handled by Sandoval. (Compl. at 2, Doc. 1 Ex. B.) During that reservation, Sandoval placed his hand over the headset and used the word "hell" in a comment to a coworker. *Id.* On September 15,

2005, Sherri Keller, Sandoval's manager, issued a letter stating that Southwest had decided to terminate Sandoval's employment. (*Id.* at 3; Keller Aff. ¶ 1, Doc. 31 Ex. A.) Sandoval participated in a union grievance process against Southwest. (Compl. at 3, Doc. 1 Ex. B.) On November 14, 2005, Sandoval was informed that his case had been closed. (*Id.*)

Sandoval's employment with Southwest was subject to a collective bargaining agreement (CBA) between Southwest and the IAM. (Carey Aff. ¶ 5, Doc. 3 Ex. A.) Instead of entering into employment contracts with individual reservation sales agents, Southwest enters into a collective bargaining agreement with the agents' bargaining representative, the IAM. (Keller Aff. ¶ 3, Doc. 31 Ex. A.)

The CBA states that the IAM is the exclusive bargaining agent for Southwest's customer service employees. (CBA art. 2.A, Doc. 3 Ex. A. Attach. 1.) It states that all work performed by customer service and reservation agents comes under the jurisdiction of the IAM and is covered by the CBA. (*See id.* arts. 2.B, 5.) It provides, "Employees covered by this Agreement shall be governed by all reasonable Company rules, regulations and orders previously or hereafter issued by proper authority of the Company which are not in conflict with the terms and conditions of this Agreement." (*Id.* art. 2.E.) Southwest retains the right to manage and direct its workforce, subject to the provisions of the CBA. (*Id.* art. 2.F.)

The CBA provides procedures for discipline of covered employees, including disciplinary hearings. (*See id.* art. 20.) Possible punishments include letters of reprimand or warning, loss of pay, and discharge. (*Id.* art. 20.C.) The CBA provides that no employee who has completed his probationary period may be disciplined to the point of extent of loss of pay or discharge without first having the benefit of a hearing with the right to have a union representative present. (*Id.*) It states

that in assessing the discipline imposed Southwest will consider the gravity of the offense, the employee's overall work record, and seniority. (*Id*. art. 20.1.J.) It also provides procedures for grievances. (*Id*. art. 20.1.A, B.) The CBA creates a System Board of Adjustment pursuant to the RLA. (*See id*. art. 20.2.) The Board is limited to determining whether the employee was disciplined for proper cause, except that it may modify the penalty assessed by Southwest if it finds that the penalty was arbitrary or unreasonable. (*Id*. art. 20.2.E.)

Southwest issued a Reservations Center Employee Guidebook (Guidebook) to its reservations employees. (*See* Guidebook, Doc. 31 Ex. A Attach. 2.) It states that "any type of phone misuse," "use of profanity," "rudeness," or "improper voice tone" is "unacceptable in the performance of [the] job." (*Id*. at 2.) "Based on the severity of the incident, disciplinary action will be taken, up to and including termination." (*Id*.) The Guidebook also lays out a system of progressive discipline, which "may be implemented whenever an Employee's conduct or job performance is found to be deficient in some way." (*Id*. at 16.) It is intended to "correct the problem without official discipline when at all possible." (*Id*.) Steps in the progressive discipline system may be bypassed depending on the severity of the performance problem. (*Id*.)

On March 8, 2006, Sandoval brought this action in the Second Judicial District Court, Bernalillo County, State of New Mexico. (*See* Compl., Doc. 1 Ex. B.) Southwest filed a Notice of Removal in this Court on April 25, 2006. (Doc. 1.) Southwest states that its notice of removal is brought pursuant to two statutes: 28 U.S.C. §§ 1441 and 1446. (*Id*.) The basis for removal is grounded mainly in § 1441, providing for removal by the defendant of actions within the original jurisdiction of the federal district courts.

Southwest filed a motion to dismiss (Doc. 2) and Sandoval filed a motion to remand (Doc.

3

12).  On June 16, 2006, I ordered Southwest to file relevant portions of the Guidebook.  (Doc. 27.)  I also converted the motion to dismiss into a motion for summary judgment and allowed the parties to file any other evidence pertinent to the issues raised in the motion to dismiss.  (*Id*.)  Both parties filed supplemental responses.  (*See* Docs. 31, 32.)  Southwest also filed a reply.  (Doc. 34.)  On July 21, 2006, Sandoval filed a motion to strike Southwest's reply, arguing that the reply was not permitted by the Court's Order, the local rules, or the Federal Rules of Civil Procedure.  (Doc. 36.)  Southwest has filed a response to the motion.[1]  (Doc. 37.)

## LEGAL STANDARDS

Federal removal jurisdiction is statutory in nature.  *Archuleta v. Lacuesta*, 131 F.3d 1359, 1370 (10th Cir. 1997).  "It is well-established that statutes conferring jurisdiction upon the federal courts, and particularly removal statutes, are to be narrowly construed in light of our constitutional role as limited tribunals."  *Pritchett v. Office Depot, Inc.*, 420 F.3d 1090, 1094-95 (10th Cir. 2005) (citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108-109 (1941), and *United States ex rel. King v. Hillcrest Health Ctr.*, 264 F.3d 1271, 1280 (10th Cir. 2001)).  All doubts should be resolved against removal.  *Id.* at 1097.  When a federal court lacks subject matter jurisdiction over a removed case, it must remand the case to the state court.  *Topeka Housing Auth. v. Johnson*, 404 F.3d 1245, 1247 (10th Cir. 2005) (citing 28 U.S.C. § 1447(c)).  "Defendant, as the party asserting jurisdiction, has the burden of proving all jurisdictional facts and of establishing a right to removal."  *Chavez v. Kincaid*, 15 F. Supp. 2d 1118, 1119 (D.N.M. 1998).

"[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court

---

[1] Sandoval's motion is well-taken and will be granted.

of the United States." 28 U.S.C. § 1441(a). Under the well-pleaded complaint rule, federal question jurisdiction must appear on the face of the complaint. *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987) (citing *Gully v. First Nat'l Bank*, 299 U.S. 109, 112-113 (1936) ("The presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint."). A case may not be removed to federal court on the basis of a federal defense, including preemption, even if the defense is anticipated in the complaint or both parties agree that it is the only question truly at issue. *Id.* (citing *Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 12 (1983)).

There is, however, an "independent corollary" to the well-pleaded complaint rule. *See id.* at 393. Under the complete preemption doctrine, a statute may have such preemptive force that it converts a state-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule. *See id.* "[I]f a federal cause of action completely preempts a state cause of action any complaint that comes within the scope of the federal cause of action necessarily 'arises under' federal law." *Franchise Tax Bd.*, 463 U.S. at 24.

### DISCUSSION

Congress passed the RLA "to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994). The RLA provides a mandatory arbitral mechanism for the resolution of two classes of disputes: "major" disputes and "minor" disputes. *Id.* "[M]ajor disputes seek to create contractual rights, minor disputes to enforce them." *Cons. Rail (Conrail) Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 302 (1989). Minor disputes are "disputes between an employee

. . . and a carrier . . . growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." *Davies v. Am. Airlines, Inc.*, 971 F.2d 463, 465 (10th Cir. 1992) (citing 45 U.S.C. §§ 153 First (i) & 184) (ellipses in original). The remedy provided under § 153 of the RLA is mandatory and exclusive for such disputes, and the courts generally lack jurisdiction to hear them. *Id.* (citing *Andrews v. Louisville & Nashville R.R. Co.*, 406 U.S. 320, 322, 325 (1972) & *Barnett v. United Air Lines*, 738 F.2d 358, 361 (10th Cir. 1984)).

"The threshold question in determining whether a state law claim is a 'minor dispute' preempted under the RLA is whether resolution of the claim requires interpretation or application of a CBA." *Ertle v. Continental Airlines, Inc.*, 136 F.3d 690, 693 (10th Cir. 1998). State-law claims are also preempted by the RLA as minor disputes if the claims are "inextricably intertwined" with a CBA. *Id.* If the dispute arises from rights created by the terms of a labor agreement, the claims are preempted. *Id.* "Claims are also preempted if 'they implicate practices, procedures, implied authority, or codes of conduct that are part of the working relationship.'" *Id.*

Courts are wary of plaintiffs' attempts to bring contract claims as state law tort actions.[2] *See United Ass'n of Journeymen & Apprentices of the Plumbing & Pipe Fitting Indus. v. Bechtel Power*

---

[2] *Bechtel Power* involved preemption under § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185. I will rely on cases applying the LMRA standard for preemption because the preemption standard is the same under the RLA and the LMRA. *See Norris*, 512 U.S. at 260 ("The pre-emption standard that emerges from [RLA cases]--that a state-law cause of action is not pre-empted by the RLA if it involves rights and obligations that exist independent of the CBA--is virtually identical to the pre-emption standard the Court employs in cases involving § 301 of the LMRA."); *Fry v. Airline Pilots Ass'n Int'l.*, 88 F.3d 831, 835 (10th Cir. 1996) (noting that *Norris* expressly adopted the § 301 standard--whether a claim's resolution depends on interpretation of a CBA--for resolving claims of RLA preemption); *Davies*, 971 F.2d at 466 (quoting *Lingle*, 486 U.S. at 405-06) ("Under the LMRA, like the RLA, preemption occurs 'if the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement.'").

*Corp.*, 834 F.2d 884, 887-88 (10th Cir. 1987) ("Plaintiffs . . . often attempt[] to avoid federal jurisdiction under § 301 by framing their complaints in terms of such diverse state law theories as wrongful discharge, intentional infliction of emotional distress, conspiracy, and misrepresentation."). Therefore, "federal courts look beyond the allegations of the complaint, often to the petition for removal, to determine whether the wrong complained of actually arises in some manner from a breach of the defendants' obligations under a collective bargaining agreement." *See id.*

"[N]ot every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301 or other provisions of the federal labor law." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985). The RLA does not preempt claims seeking to enforce rights that are independent of the CBA. *Norris*, 512 U.S. at 256; *see also Williams*, 482 U.S. at 396 ("[A] plaintiff covered by a collective-bargaining agreement is permitted to assert legal rights *independent* of that agreement, including state-law contract rights, so long as the contract relied upon is *not* a collective-bargaining agreement.") (emphases in original).

I will first consider whether Sandoval's claims are preempted by the RLA because they require interpretation or application of the CBA, turning first to Sandoval's allegation that the Guidebook created an express contract. (Compl. at 4-5, Doc. 1 Ex. B.) In *Galway v. Smith's Food and Drug Ctr., Inc.*, No. 94-4224, 72 F.3d 137, 1995 WL 734423 (10th Cir. Dec. 11, 1995) (unpublished table decision), the Tenth Circuit addressed whether a claim of breach of an implied contract regarding required procedures prior to employee discharge was preempted by § 301 of the LMRA.[3] *Id.* at *2.

---

[3] I rely on cases involving alleged breaches of an implied contract because an employee handbook may constitute an implied contract in New Mexico. *See Garcia v. Middle Rio Grande Conservancy Dist.*, 121 N.M. 728, 731, 918 P.2d 7, 10 (1996) ("[A]n employee handbook may constitute an implied employment contract."). I have found no authority suggesting that an employee handbook can give rise to an express contract in New Mexico. I will, however, assume for purposes of this analysis that the relevant portions of the Guidebook could constitute an express contract.

7

The employee argued that terms in the employee handbook requiring that employees be given an opportunity to rehabilitate themselves created an implied contract. *Id.* The court stated that any implied contract involving employee discharge could not have operated apart from the CBA. *Id.* It noted that the CBA "governed employee discharges and provided grievance and arbitration procedures through which the employee could challenge a discharge as wrongful." *Id.* The court held that a "determination that [the employer] breached the terms of a contract implied in the employee handbook would require interpretation of the employee discharge provisions in the collective bargaining agreement." *Id.*

The Tenth Circuit also considered a claim for breach of implied contract in *Garley v. Sandia Corp.*, 236 F.3d 1200 (10th Cir. 2001). The plaintiff argued that his claim was based exclusively on an implied contract that was created by the terms of the employer's Personnel Policy, Code of Ethics, and Director's Memo. *Id.* at 1210. The Tenth Circuit concluded that the documents relied on by the plaintiff were "intended to be read in harmony with the CBA." *Id.* It noted that the Personnel Policy specifically referred the reader to a separate section for rules governing the discipline of represented employees. *Id.* at 1210-11. It also noted that the Director's Memo indirectly referenced the CBA by stating that when formal actions became necessary due to poor performance, "managers should invite the employee to obtain union representation if the employee is represented." *Id.* at 1211 (emphasis deleted). The court concluded that "the documents upon which Garley relies are 'inextricably intertwined with consideration of the terms of the labor contract.'" *Id.* at 1211 (quoting *Allis-Chalmers*, 471 U.S. at 213).

Assuming that an employee handbook could give rise to an express contract, *cf. Garcia v. Middle Rio Grande Conservancy Dist.*, 121 N.M. 728, 731, 918 P.2d 7, 10 (1996) ("[A]n employee

8

handbook may constitute an implied employment contract."), I conclude that in this case, as in *Galway*, a determination of whether there was a breach of contract would require interpretation of the CBA. Sandoval first contends that Southwest breached an express contract by failing to employ progressive discipline. (Compl. at 4-5, Doc. 1 Ex. B.) Article 20 of the CBA provides standards and procedures for disciplinary hearings, which may include discipline up to and including termination. (CBA art. 20.1.C, Doc. 3 Ex. A. Attach. 1.) It includes factors that must be assessed in assessing discipline. (*Id*. art. 20.1.J.) The CBA also states that Southwest retains the right to manage its workforce subject to the provisions of the CBA. (*Id*. art. 2.F.) In addition, the CBA states that "[e]mployees covered by this Agreement shall be governed by all reasonable Company rules, regulations and orders previously or hereafter issued by proper authority of the Company which are not in conflict with the terms and conditions of this Agreement." (*Id*. art. 2.E.) Whether Southwest was required to exercise progressive discipline requires interpretation and application of the CBA.

The portions of the Guidebook upon which Sandoval relies are inextricably intertwined with the CBA. Progressive discipline involves five steps: (1) verbal warning, (2) letter of instruction, (3) hearing and warning letter, (4) hearing and final warning letter, and (5) hearing and termination. (Guidebook at 16, Doc. 31 Ex. A Attach. 2.) The Guidebook states that steps 3 through 5 are "official discipline requiring a hearing prior to administration." (*Id*.) The Guidebook therefore indirectly references the CBA because of its reference to disciplinary hearings, the procedures and standards for which are set out in Article 20 of the CBA. (*See* CBA art. 20.C, Doc. 3 Ex. A. Attach. 1.) The CBA also states, as noted above, that Southwest employees are governed by only those rules that are not in conflict with the CBA and that Southwest has the right to manage its workforce

subject to the provisions of the CBA. (*Id*. art. 2.E, F.) In addition, the CBA lays out factors Southwest must consider in imposing punishment. (*Id*. art. 20.1.J.) I conclude that the Guidebook was "intended to be read in harmony with the CBA," *see Garley*, 236 F.3d at 1210, and that the provisions of the Guidebook on which Sandoval relies are "inextricably intertwined with consideration of the terms of the labor contract," *see id.* at 1211 (quoting *Allis-Chalmers*, 471 U.S. at 213).

Sandoval states that the Guidebook does not reference or cite the CBA. (Doc. 30 at 3.) It is not necessary for preemption that an employee handbook directly reference the CBA. *See Garley*, 236 F.3d 1210-11. Rather, an employee handbook may indirectly reference the CBA, which I have determined that the CBA did here. *See id.* Sandoval also states that a provision in the CBA provides that "Company/Department guidelines will apply" to bilingual agents. (Doc. 30 at 2; *see* Doc. 32 Ex. 1.) The provision more fully states that "all other *applicable* Company/Department guidelines will apply." (Doc. 32 Ex. 1 (emphasis added).) It would still be necessary to interpret and apply the CBA in order to determine whether the other company guidelines are applicable.

Sandoval also argues that Southwest breached an express contract arising from the Guidebook when it engaged in dishonest and hostile behavior and intentionally misinterpreted its policies in order to discharge him. (Compl. at 4-5, Doc. 1 Ex. B.) As with Sandoval's claim that Southwest did not employ progressive discipline, the resolution of these claims would require interpretation the terms of the disciplinary procedures set out in Article 20 of the CBA. As in *Garley* and *Galway*, these claims are preempted by federal labor law.

Sandoval's implied contract claim is preempted by the RLA as well. Sandoval contends that the Guidebook created a contract under which Southwest was bound by the policies and procedures contained in the Guidebook. (*Id.*) He argues that Southwest breached this implied contract by failing

to abide by those policies and procedures. (*Id.* at 5.) To be sure, the Guidebook could have created an implied contract, *see Garcia*, 121 N.M. at 731, 918 P.2d at 10, and I will assume that it did. However, Sandoval's claim would be subject to an analysis similar to that of his breach of contract claims. It would still require interpretation of the CBA to determine whether a breach occurred, and it is inextricably intertwined with the CBA.

Sandoval also asserts that Southwest breached an implied covenant of good faith and fair dealing. (Compl. at 6, Doc. 1 Ex. B.) Whether express or not, in New Mexico every contract imposes a covenant of good faith and fair dealing upon the parties to the contract. *WXI/Z Southwest Malls v. Mueller*, 137 N.M. 343, 350, 110 P.3d 1080, 1087 (Ct. App. 2005). The New Mexico Supreme Court has defined the covenant as follows:

> The concept of the implied covenant of good faith and fair dealing requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement. Denying a party its rights to those benefits will breach the duty of good faith implicit in the contract.

*Planning & Design Solutions v. City of Santa Fe*, 118 N.M. 707, 714, 885 P.2d 628, 635 (1994).

To determine whether Southwest breached a covenant of good faith and fair dealing, it would be necessary to determine what benefits each party was due under the contract Sandoval contends was created by the Guidebook. As I have concluded, to do so would in turn require an interpretation of the CBA. Further, his claim is inextricably intertwined with the CBA. Sandoval's claim is therefore also preempted by the RLA.[4]

---

[4] I have determined that resolution of Sandoval's claims would require interpretation or application of the CBA and that his claims are inextricably intertwined with the terms of the CBA. Therefore, I need not decide whether Sandoval's claims "implicate the practices, procedures, and codes of conduct that were part of the working relationship between [Sandoval] and Southwest." (*See* Doc. 31 at 9.) I also need not decide whether the Guidebook created an express or implied contract or whether Southwest breached any such contract. (*See id.* at 9-12.) Because I have concluded that there is federal question jurisdiction, I need not address whether the amount in controversy exceeds $75,000. (*See* Doc. 15 at 1-2.)

## CONCLUSION

For the foregoing reasons, I conclude that Sandoval's claims are preempted by the RLA. The motion to strike Southwest's reply will be granted, the motion to remand will be denied, and the motion to dismiss, converted into a motion for summary judgment, will be granted.

IT IS THEREFORE ORDERED that Sandoval's Motion to Strike Defendant's Reply (Doc. 36) is GRANTED.

IT IS FURTHER ORDERED that Sandoval's Motion for Remand (Doc. 12) is DENIED.

IT IS FURTHER ORDERED that Southwest's Motion to Dismiss (Doc. 2), filed on April 25, 2006, and converted into a motion for summary judgment on June 16, 2006 (*see* Doc. 27), is GRANTED.

IT IS SO ORDERED.

*William P. Lynch*
_____
WILLIAM P. LYNCH
UNITED STATE MAGISTRATE JUDGE

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.

12

NOTICE: THIS IS AN UNPUBLISHED OPINION.(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA10 Rule 36.3 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Tenth Circuit.
Andrew GALWAY, Plaintiff-Appellant,
v.
SMITH'S FOOD AND DRUG CENTER, INC., a corporation, Defendant-Appellee,

**No. 94-4224.**

Dec. 11, 1995.

Before TACHA, MCWILLIAMS, and HENRY, Circuit Judges.

ORDER AND JUDGMENT [FN1]

> FN1. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470.

**\*1** Andrew Galway sued Smith's Food and Drug Centers, Inc. for breach of employment contract, abusive discharge, and intentional infliction of emotional distress. The district court granted summary judgment in favor of Smith's, and Galway appeals. Our jurisdiction arises under 28 U.S.C. 1291. We affirm.

Galway was employed by Smith's until April 14, 1993, when he was discharged for allegedly destroying company property. Galway was a member of the United Food and Commercial Workers Union, Local 711, and was a beneficiary of a collective-bargaining agreement between Smith's and the union called the Foodhandler's Agreement. Galway filed suit in Utah state court claiming that he was terminated in violation of the Foodhandler's Agreement. Smith's removed the case to federal court, and Galway filed a motion to remand. The district court denied the motion.

Smith's then filed a 12(b)(6) motion to dismiss the case for failure to state a claim upon which relief can be granted. Since both parties submitted evidence outside the pleadings, the district court properly treated Smith's motion as a motion for summary judgment. Fed.R.Civ.P. 12(b); Ketchum v. Cruz, 961 F.2d 916, 919 (10th Cir.1992); Nichols v. United States, 796 F.2d 361, 364 (10th Cir.1986). The district court granted the motion as to all claims. Galway now appeals both the order denying his motion to remand and the order granting summary judgment.

Galway's notice of appeal states only that he appeals the order granting summary judgment; the notice of appeal does not indicate that he appeals the denial of his motion to remand. Under Rule 3(c) of the Federal Rules of Appellate Procedure, "the notice of appeal ... shall designate the judgment, order or part thereof appealed from...." The requirements of Rule 3 are jurisdictional: fulfillment of the requirements is a prerequisite to appellate review, and noncompliance is "fatal to an appeal." Smith v. Barry, 502 U.S. 244, 248 (1992). Because Galway failed to comply with Rule 3 by not including the denial of his motion to remand in his notice of appeal, we have no jurisdiction over that claim. Thus we consider only Galway's appeal of the order granting summary judgment to Smith's.

Galway claims that Smith's terminated his employment in violation of the Foodhandler's Agreement. Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. 185, governs a cause of action for breach of a collective-bargaining agreement. Section 301 preempts all state law causes of action for violation of a collective-bargaining agreement. United Steelworkers of America v. Rawson, 495 U.S. 362, 368 (1990). Thus section 301 preempts Galway's state law claims for wrongful discharge, intentional infliction of emotional distress, and breach of implied contract of employment.

When state law claims can be resolved only by interpretation of a collective bargaining agreement, those claims are preempted by federal labor-contract law. *Allis-Chalmers v. Lueck,* 471 U.S. 202, 218-221 (1985). This circuit has held that state law claims for wrongful discharge are preempted by section 301, because determination of an employer's liability requires interpretation of the collective bargaining agreement provisions governing employee discharge. *Saunders v. Amoco Pipeline,* 927 F.2d 1154, 1156 (10th Cir.), *cert. denied,* 112 S.Ct. 264 (1991). Thus Galway's wrongful termination claim fails.

**\*2** Section 301 also preempts Galway's claim for intentional infliction of emotional distress. A claim for intentional infliction of emotional distress is preempted when the claim involves an employee's discharge, the allegations relate to rights derived from a collective bargaining agreement, and the employee could have used the grievance procedure in the collective bargaining agreement to seek redress. *Johnson v. Beatrice Foods Co.,* 921 F.2d 1015, 1020 (10th Cir.1990). In his intentional infliction of emotional distress claim, Galway asserts that he did not steal company property and that he was discharged because he refused to admit guilt. Thus Galway's claim relates to the manner in which he was discharged and his right under the collective bargaining agreement to be discharged only for cause. However, neither Galway nor the union pursued his grievance to arbitration. Consequently, section 301 preempts his intentional infliction of emotional distress claim.

Section 301 preempts Galway's state law claim for breach of implied contract as well. The employee handbook for Smith's required that employees be given a chance to rehabilitate themselves before they are terminated. Galway argues that these terms created an implied contract that was breached by his discharge. However, any implied contract involving employee discharge could not have operated apart from the Foodhandler's Agreement. The Agreement governed employee discharges and provided grievance and arbitration procedures through which the employee could challenge a discharge as wrongful. A determination that Smith's breached the terms of a contract implied in the employee handbook would require interpretation of the employee discharge provisions in the collective bargaining agreement. Therefore this claim, like Galway's other state law claims, is preempted by the LMRA.

Galway's claim for breach of the Foodhandler's Agreement could have proceeded only as a section 301 claim. Before bringing suit under section 301, an employee must pursue the contractual remedies upon which the union and the employer have agreed. *United Paperworks Int'l Union v. Misco, Inc.,* 484 U.S. 29, 37 (1987). The Foodhandler's Agreement states that an employee should bring claims or grievances involving interpretation, application, or violation of the provisions of the Agreement to his immediate supervisor. If no agreement can be reached with the employee's immediate supervisor, an employee "may" pursue the grievance to arbitration. However, the arbitration provision is effectively mandatory because a grievance is forfeited and waived if the employee does not request arbitration.

The day after Galway was discharged, the union bypassed his immediate supervisor and filed a grievance on his behalf with Smith's vice president and corporate counsel, Peter Barth. Barth responded that Galway's discharge was justified by evidence that he had destroyed cash register tapes belonging to the company. The district court held that bypassing Galway's immediate supervisor was not fatal to his claim. However, neither Galway nor the union pursued the claim to arbitration, even though Galway strenuously contested both the assertion that he stole company property and the manner in which he was discharged. Since his claim was not pursued to arbitration, it was forfeited and waived.

**\*3** When an employee's grievance is forfeited and waived because the union failed to pursue it, the employee must demonstrate that the union breached its duty of fair representation in order to sue the employer for breach of the collective bargaining agreement. *DelCostello v. International Bd. of Teamsters,* 462 U.S. 151, 164-65 (1983). While the employee need not name the union as a defendant in the suit against the employer, the employee must "carry the burden of demonstrating breach of duty by the Union.'" *Id.* at 165. In his complaint, Galway did not allege that the union breached its duty of fair representation by failing to pursue his grievance. Thus Galway's failure to allege that the union breached its duty, coupled with his failure to exhaust contractual remedies under the Foodhandler's Agreement, are fatal to the section 301 claim.

For these reasons, we AFFIRM the district court's order granting summary judgment.

The mandate shall issue forthwith.

C.A.10 (Utah),1995.
Galway v. Smith's Food and Drug Center, Inc.
72 F.3d 137, 1995 WL 734423 (C.A.10 (Utah)), 131 Lab.Cas. P 11,469

END OF DOCUMENT